Please rise. This court is now in session. Please be seated. And court, please call the case. 309-0530, consolidating with 309-0599, Floyd J. Rash at Appleby by Fred L. Unrath v. Drury Inns, Inc. et al., Appellants by Jeffrey D. Rock. Counsel, you may proceed. May it please the court. Counsel. My name is Jeffrey Rock. I represent Drury Inns on this appeal. I want to start briefly by looking at the plaintiff's complaint in this cause, because I think it's critical. The plaintiff's amended complaint, which is the complainant issue, alleged three deficiencies. It said the notice given by the defendant in this case was not effective. It said the notice was not taken pursuant to the right of first refusal, the agreement that everybody agrees was applicable in this case. And that the plaintiff, Rashid, asked for more time, and there was an oral agreement that he would have more time to move the structure that had been abandoned on this property. I point that out because I want to show what the complaint does not show and what the record did not show. The record did not state, and the amended complaint does not state, that Rashid didn't receive the notice directly from his attorney. So he received the notice. Second, there's no testimony and there's no allegation in the complaint that Rashid misunderstood the notice that he received. I think you can search the record and there's no indication of that. Thirdly, that Rashid nor his attorney ever mentioned to jury ends that they thought the notice was not effective or that they misunderstood the notice at any point in time, including the trial in this case. Again, I think if you look at the record, there is no testimony where either Julian Cannell or Floyd Rashid came in before the trial court and said, well, we didn't understand this notice that we got from jury ends. We misunderstood, we thought it was bad, and we thought it was a problem. Did the notice comply with the most recent contract? No. The notice was deficient in that it was sent directly to the attorney instead of Floyd Rashid, who was the party to the case. It also miscited the agreement to which it would apply, frankly. But everybody agreed at the trial court that the right of first refusal agreement was the only agreement in force between the parties. And again, I would ask the court to search that record for any indication that either Julian Cannell or Floyd Rashid thought that it meant anything other than that. Because when you think about it, how easy would it be for the plaintiff to come in and say, I didn't understand that notice, it was confusing, it didn't come to me, I was prejudiced. Somehow that notice caused me a problem. I don't think you're going to find that in the record or especially in the pleadings themselves. How many days after the notice did the property get demolished? It was about six months, roughly six months. There was testimony, there was some further negotiations, but Drury had started with the engineers in the city and was clicking along, I think, during that period of time. I think what you'll find here is Attorney Julian Cannell, who represented Mr. Rashid, said in an answer to the trial judge, he said, well, did you think there was a problem with this notice? And he said, well, it was my opinion that there might be a problem with the notice. The trial judge asked him, well, not to put a bad spin on this, but were you keeping this in your hip pocket? And Mr. Cannell said yes. He said, I did not and would not tell the other side that I believe this might be improper notice in any way. Now, that standing alone, I don't think Mr. Cannell has a duty to step forward, but I think the court needs to look at what followed that. Right after that notice was given, the attorney for Drury sent a letter to Attorney Cannell and said, look, we understand there's a rumor out there that Mr. Rashid is going to move this property just a few feet onto this other property, which is prohibited under our agreements. Attorney Cannell writes Drury's attorney back and says, we'll move the house within 10 days and we're not going to move it over onto this property, which we understand we can't move it to. Dr. Rashid testified at trial. After he got this notice, he called the representative Drury in and asked for more time to move the property. And then finally, the attorney for Drury ends, writes Dr. Rashid's attorney again and says, look, okay, we understand you're not going to move it over onto this property that you can't move it to, and that it'll be down, it'll be demolished within, or not demolished, moved within 14 days. This is the beehive of activity that took place within 10 days after this notice went out. At no time did Cannell or Rashid say, look, we think this notice is bad, we think you haven't given us the proper notice, you haven't referred to the proper agreement. They're acting all the while as though this notice is perfectly proper because they're saying we'll get the thing moved within 10 days. We won't move it over to this property. Yes, we agree we won't move it to this other property. And that's what the crux of this case is. Was there a material breach of the contract by Drury by giving this notice that admittedly went to the attorney instead of the party and misdescribed the agreement to which it attached? I think you'll find that there was no confusion on anyone's part. What the crux of this case was, which the trial court avoided, and I think this was the thrust of the testimony,  where he talked with the Drury representative, and the Drury representative orally told him, look, you can have time to move the property, we don't care, we'll notify you when we're ready. That's not credible testimony if you look at the testimony of Drury and his representative and his attorney. They testified under oath at trial, both of whom are attorneys, and said, considering our previous dealings with the plaintiff, we made an agreement before we ever went to this May meeting that we would not be alone in the room with Mr. Rashin and his attorney. And both Joe Pierlis and Charles Rock said we were never apart. We stuck to that because we were concerned about what might be said if we were in that room alone, if we weren't both together. And, in fact, Drury's attorney stood up at the end of that meeting and said, we're in agreement. There were no agreements reached here today. And, in fact, we're just going to rely on what we've already got, what's in writing. If they were that concerned at that point in time, why not issue another notice? Because the home wasn't demolished for about another 30 days. It was demolished for two. About another 30 days. So why not send a notice and say, okay, in 14 days the house comes down? Well, there's no testimony about that, Justice Wright, one way or the other. I can only answer that they had sent the notice. Drury had been working with both the contractor and the city to get it done. There's no evidence on that one way or the other. On what, one way or another? About whether why there wasn't another notice sent  more than 14 days after that meeting before the house came down. Correct. The notice came in November, and there wasn't much done in the end of November, first part of December, when the 14 days ran. So why have the meeting in May? The meeting actually involved a separate item. There were two pieces of property. Drury bought one from Ratchet, bought about three acres at $9.50 an acre, and there was some additional land. And Drury asked, and that was the point of the first refusal, was, look, we want the opportunity to buy this other parcel of land. And the May meeting, I think, was, it's undisputed, that was to come in and talk about purchasing this other section of land. Was the house ultimately demolished, the second house? Was that partially situated on the second piece of property that you were discussing at the May meeting? Correct, and the first property. But it was covered by that right of first refusal. I mean, everybody understood it was on both, but this was going to be commercial property. This was a 52-year-old ranch house that had construction materials in it that was sitting on both, so they both had access. The agreement had been reached in May to purchase that second piece of property. The house could go with it. No, there was a discussion about purchasing. There was no agreement to purchase in May. The parties, in fact, said, well, the meeting didn't end very well, and there was no agreement to purchasing more property. But I think if you look at the testimony, that's the thrust of this case that the plaintiff was saying, look, they gave me additional time by oral representation at this meeting. It didn't really involve the notice because there's no testimony, really, by the plaintiff or his attorney that they misunderstood what was meant. Let's assume for the sake of argument that that conversation did not occur. There was no additional time discussed. Everybody remained in the room. They weren't alone with the gentleman that owned the house. If there had been some sort of an agreement to purchase the property, though, that house would no longer have been an issue. Well, I think it would have in that even though it – because it sat half on the property that Drury purchased. And half on the piece that they were talking to. Half on the other piece. But the plaintiff wanted that house to pick that house up and move it elsewhere. So, I mean, I think the house is still an issue. I mean, even if Drury owned both, you know, I don't know what would have happened, but I assume there would have been some accommodation that, all right, you can still take the house even though we own all the land. And you don't think having that meeting gave Rashid the idea that this demolition notice that was previously served may be off the table? Because it had been months, hadn't it? Well, there's no indication that Rashid thought that, that he testified to that. And this was one way or the other, right? One way or the other. Right. And certainly there was no testimony from Drury about that. This was simply, well, we had a right of first refusal on this land. We may want to purchase it now. Let's have a meeting and let's discuss whether or not we can agree to terms to buy this second parcel. That's what the main meeting was really about. It really didn't have anything to do with this house other than the plaintiff testified that he spoke with the Drury representative while his attorney was out of the room and the Drury representative agreed to extend the time. But I think what this case is really about, if you look, the question is was there a material breach of the right of first refusal by Drury? Admittedly, the notice wasn't given exactly the way it should have. No question about that. But is there a material breach if there's no prejudice, if the party receiving the notice got the notice, and if the party receiving the notice understood what it meant? And, and this is the important part, and active part, in the face of what Julian Cannell said might be a bad notice, he's sending written correspondence to Drury's attorney saying, okay, fine, we'll knock down the house or we'll move the house in 10 days. And oh, yes, we won't move it over onto this parcel where you told us you couldn't move it. That's not the conduct of somebody who says, well, I've got a bad notice, I'll just sit on my hands, and if they do something bad, then I've got a cause of action. There's another way to look at this, whether, when does someone have the right to demolish property? When do you have the right to do that? I'm sorry? Another way of looking at it is when do you really have the right to demolish someone else's property? Well, the contract specifically provided the later of November 1st or 14 days after you get a notice. So, I mean, it's a contractual matter, it seems to me, and if you give the notice and the parties understood the notice, appreciated the notice, and acted on the notice, is it a material breach that, okay, I've listed the wrong agreement and I sent it to the attorney instead of the party, as the agreement provides? Mr. Rock, what made this proceeding take so long? The original contract was for a little over a year for everything to be completed, and it ended up taking eight years. Right. What was going on? There were several different contracts in the record. I'm not sure there was a lot of testimony, Justice McDade, about why, and I can't speak to that. I mean, I don't know. I know there were numerous agreements as the parties went along through this process. But everybody was agreeing all along to extend the process. Well, I'm not sure that's accurate. There were different agreements from time to time. It wasn't as though we've got one agreement and we're just going to keep acting on that agreement. I think there were at least three and maybe four, if I remember, different agreements. But they all related to the same transaction. Generally, yes, yes. There were different segments of that transaction as it progressed, is the best I can see from those documents. But everybody agrees the right of refusal was the last agreement that was entered into by the parties. What is the date that Mr. Rashid received the notice? The best the testimony shows was the day it was sent. His attorney testified and wrote that he received the notice by fax that day of the notice and that he called Dr. Rashid right away. So, and there was never a complaint at trial, but, well, I didn't- So you're relying on notice by telephone call? From Dr. Rashid's attorney to Dr. Rashid. And that's the date that you think is operational notice? Yes, yes. We cited cases that say- If the position is 14 days after that telephone call, then you have the right- Have the right, correct. Because we've cited some cases that say notice to the attorney, especially if the attorney notifies the client, then that's notice. Donna? What about subsequently you did provide notice to Dr. Rashid, and I apologize if I'm mispronouncing names, at the address that was agreed in the- I'm sorry, was there a- I think later there was a notice sent to him at the proper address. There was a notice sent to him at his address that said, Drury Inns is changing its address. And that was sent sometime after this notice. But it was a simple change of address issue that was sent by Drury to that address to Dr. Rashid. There's been reference, you know, to- There were months have gone by, there were negotiations, and all of a sudden the house gets demolished. What was the trigger that caused that? You're negotiating, and there was this old notice that went to the attorney. Frankly- So what is the trigger that went from day one to the demolished building? Let me back up just a minute, and I can give you the sequence, I believe. There was another house that Dr. Rashid had failed to move according to the contracts. In fact, Drury Inn attorney called Drury Inn one day, this is in the testimony, and said, Well, look, that house that we now own that was never moved by Rashid is now up on wheels, they're stealing our house. And there was testimony that the right of first refusal, part of the consideration was Drury elected not to try to pursue Rashid for damages for taking that structure off the property, for moving it. And that was part of the consideration of the right of first refusal. Now we get to the May hearing. His attorney had said in November we're going to move it in 10 days. It never got moved. There was testimony that at this May 6th meeting, Rashid said, I'll move it by Monday. Then the attorney for Drury calls the city to see if there's ever been any permits issued for this thing to be moved, and there were not. And as best I can, from the testimony, I think that was the trigger. Look, we've been doing this dance for years. Now, once again, we get a promise it's going to be Monday, so they're smart enough to go see whether or not there's been any permits issued to move this house, and there had not. And that's what the testimony is. I don't think anybody ever asked the Drury representative, why did you do it on that day and why did you do it at that point in time? But I think that's the inference from the testimony that, look, you know, okay, one last time, and now we find out there's no permits, so there's no way this thing's going to be moved Monday, which we were told in this May 6th meeting. It had nothing to do with the amount of money he wanted for that second piece of property, which I think was viewed as outrageous. I think the testimony was it did not. I mean, I think that argument was made, but I think the Drury representative was asked that, if I recall correctly, and said, no, they didn't have anything to do with it. You know, it had been quite some time since they purchased the other party property, I'm sorry, other parcel. There wasn't a lot of talk about how badly they needed this. I mean, they had taken a long time to even get around to making an offer on it. So they just said, no, we're not interested, and it got dropped at that point. Counselor? I have one last question, Counsel, and that is with regard to your argument, as I understand it, you're saying that the notice was good enough, and after that notice was given, then your clients had the right to tear down the house at any time? Correct. I think that's what the agreement said. And you could decide, you were negotiating, but you could decide at any moment that enough is enough and we're going to tear it down. Yes. I think that's what the agreement says. Thank you. Thank you. Thank you. Good afternoon. My name is Craig Unrath, and I represent the appellee, Dr. Rashid. At the outset, I'd like to respond to two points raised by Mr. Rock's argument. He went into some detail about letters that had been exchanged after the November 7th notice had been provided, and he said, now, is that the kind of conduct that you would expect from somebody who thought this was invalid notice? Now, what he's asking for this court to do is rule on an estoppel there, that they detrimentally relied on Dr. Rashid's conduct. It is essential and very important that this court note that this is an affirmative defense that was never raised in their answer to the pleadings. It is waived. They did raise an estoppel and waiver argument as an affirmative defense, but when you read what they raised, it merely states that we waited too long. It's almost like a laches argument. It has nothing to do with detrimental reliance. Now, the second point is that he said that there is no testimony from Dr. Rashid or anyone else that we ever thought that this notice, the November 7th notice, was defective, and that is, to my mind, simply untrue. Julian Connell, the attorney for Dr. Rashid at that time, knew all along that that November 7th notice was defective in a number of different respects and may not have been enforceable, and the judge even asked him about that. He said, so did you kind of keep that in your hip pocket? Did you bring that up? And he goes, no, I didn't bring it up. I did keep it in my hip pocket. And Mr. Rock relied on that fact in his brief. He said, now look, we've got unclean hands here. Well, first off, unclean hands has nothing to do with it. We're at an accident law, not equity. But the other thing is this. We asked the same question from Joe Peerless from Drury Ends. We said, did you ever feel obligated to tell Dr. Rashid about his legal rights and obligations? He goes, certainly not. No one does that. No one goes out of their way to say, listen, it's our opinion that you should look into the legality of this or that. And there's no obligation to do so. Now, when you look at the November 7th notice, November 7, 2003 notice, this is not just a matter of a defect in mailing. I think it's very important to point this out. Under the right of first refusal, the agreement that governs this entire dispute, they must provide 14 days notice after which, and this is under the contract, after which Dr. Rashid would forfeit all ownership rights in the property and they could demolish it. That's key. You forfeit all ownership rights after 14 days. So what does that November 7th letter say? It says, dear Mr. Rashid, we just changed the locks on your house. It doesn't sound very much like notice, advance notice to me. It doesn't sound like any kind of advance notice. What that sounds like is, by the way, just letting you know, the house is ours now. Oh, by the way, you might have some personal property in there. Stop by and we'll let you borrow a key. You can go pick it up. Now, that is a pronounced breach of the right of first refusal. They're supposed to give us advance notice, and what they have done is given us notice, and this is right in the letter. It says, we intend to promptly demolish the home. What's promptly mean? Tomorrow? Because according to that November 7th letter, they could have demolished that home on November 8th and they were fully within their rights. That is not advance notice under the contract as a breach, a violation of the contract, and what you find here is that they have violated this contract in a number of different respects, and yet they demand specific performance against Dr. Rashid. In other words, Dr. Rashid, he's bound by that contract. He's got to follow the rules. They don't. The rules can be bent for them. That's okay. We don't need advance notice. Oh, and by the way, the letter didn't just say this letter is being sent under pursuant to the right of first refusal. It said this letter is being sent pursuant to the final amendment to the contract, and then it provides a date. I believe it's a 2001 date. Well, that's all fine and good, and when you look at that final amendment to the contract, that letter fully complies with its requirements. There's only one problem. That final amendment to the contract had been superseded, nullified 18 months ago. So, you know, it explicitly says this is notice under a contract that no longer exists anymore. Now, these are serious defects. Then we have the actual service. He was supposed to be served in person, personally served with written notice, and that's kind of typical for something where you're about ready to talk about demolishing someone's home. The written notice must be served personally or sent by registered mail, return receipt requested. Neither of those were done. It's supposed to be sent to Dr. Rashid's address. That wasn't done. It was faxed to his attorney. Did he know about this letter? Yes. Yeah, we're not contesting that. Was it effective under the contract? Absolutely not. We knew it. This wasn't something that we came up with after the fact. This is something that we always looked at this and wondered, what kind of notice is this? Now, how did Dr. Rashid respond to this November 7th letter? First thing he does is he gets on the phone. He calls up. He says, I need more time. He just made an agreement with a house mover that said we're going to move it in the spring of 04. That was made on October 28th, 03. And what does the jury do? They say, well, sure, you can have more time. This wasn't the first time that it had been requested. And every single time, juries had said, fine, you can have more time. But then it gets interesting. One month after the November 7th letter is sent, they send another letter. And they said, let's redo the entire deal. Forget about that prompt demolition. We're going to do a different deal here. We're going to buy more of your property. And when that deal closes, we'll give you 60 days beyond the closing date to move your home. So let's get together and talk about this. Now, do you think that the day they sent that letter, that the next day they could have demolished his home? They're saying that they could have, even though they've just said, listen, we're going to renegotiate. Now, to my mind, the November 7th letter was nullified at that point. They certainly couldn't say, let's forget about promptly demolishing it. Let's talk about a new deal and then tear down the house the next day. So I have some serious problems with that. Now, they have their meeting. They wait five months. So clearly, time is not an issue here. May 6th, the meeting comes in. It's undisputed that everyone had kind of a bad taste in their mouth at that meeting. It didn't go well. We have conflicting testimony from two attorneys, two officers of the court that cannot be reconciled. I think we can all understand the trial judge Corey's reluctance to rule on that issue of fact. What he did was he ruled on performance under the contract. And they didn't just breach the notice provisions. They breached the very essence of the notice of demolition. Now, Justice Wright, you had raised one big point here. At the close of the May 6th meeting, negotiations had broken down. We're not going to buy the new land. I guess we're back to square one. Oh, by the way, what had happened during these five months? Dr. Rashid had been hiring engineers. He had to get his property on Forest Hill Park. Drurian knew all about all this. He kept them up to date on all this. Now, why, at the end of that May 6th meeting, couldn't they say, we're going to start tearing your house down right now? This is it. We've had enough. They didn't say anything. There's testimony where Dr. Rashid said that he was going to tear it down or move it on Monday. Dr. Rashid testified that that didn't occur. Again, we're at loggerheads there. We have conflicting testimony. In the end, they just felt that they could do it. They turned around. They said, we've got this right of first refusal, or this November 7th letter. It's seven months old now. We've already verbally, orally delayed it once. We, in writing, said let's put the whole thing on hold. But now we're going to enforce it and we're not going to tell you about it. You add all this up, and quite frankly, what happened here was wrong. And I think that Judge Carice saw that. This should not have happened. Jurians knew that Dr. Rashid had bought this property on Forest Hill. They knew that he was trying to move that property. All they had to do was pick up the phone and say, this is it. We're done. Our patience has run out. But they didn't. Finally, I'd like to just call the court's attention to a case of Counsel, are you conceding that would have been good enough to pick up the phone at that point on May 6th or May 7th, 2004? I think that they owed him at least that much. Whether it would be sufficient is another thing entirely. I think actually sufficient notice would have been under the right of first refusal, 14 days advance notice set by registered mail or delivered or served in person. Because that had never happened. All Dr. Rashid ever got notice of was a letter saying something had already happened. His property had already changed hands. And that just doesn't wash. I think it's important to point out the fidelity decision that was cited in our brief, that when you boil that case down, it basically says that where parties include in their contract time-sensitive obligations, notice provisions take on an entirely new significance. There's law on both sides of that issue as to whether you can enforce notice provisions. And I'd like to point out that in a case like this where you're talking about demolishing somebody's home, that there are time-sensitive obligations that those notice requirements can be enforced. And even if they're not, the provisions stating that you must provide advance notice must be enforced. Could I ask you to speak to damages? Only half of that house was his? No, I would disagree, Your Honor, respectfully. The land was only half his, but the home was fully owned by Dr. Rashid. But it was sitting on land right on the property line. And that was the whole idea. All he had to do was get it on the other side of that property line, and he owned the house in full. And that's why he bought the land on Forest Park. I'm sorry, I think it's Forest Hill. If he could put that house up on wheels and move it to Forest Hill Avenue, it was entirely Dr. Rashid's home. Now under the November 7th letter, you're right, you raise a good point, because the jury ends without any notice at all, change the locks. As far as they were concerned, they owned the thing, lock, stock, and barrel. And I guess that's what to me stinks about this case, is that they knew that he was trying. They knew that he had problems. The Forest Hill land had to be leveled. He had to get some engineering reports. He was running into delays, but he was moving forward. Something could have been done. All I know is that it wasn't enough. Are there no further questions from the panel? Thank you very much. Counsel. I'd like to address two things. I heard about what's right and wrong and what's in the contract. And what I didn't hear was that when Julian Cannell was sending letters to Drury's attorney saying, we're going to move it in 10 days, that there was any confusion about this notice. I didn't hear anything in counsel's argument that there was any confusion about this notice. And I come back to, was there a material breach of the contract by the errors in this notice? And I think that's the issue the court needs to decide. I'm going to talk about the equities in a second, because there's another side to that. But the McKenna case that I cited said whether there's a material breach is governed by inherent justice. And here, there has been no testimony that the plaintiff misunderstood what this notice was or the import of that notice. They took immediate action for a while until the heat went off. Mr. Emmerath said, well, they could have called and they could have done something. The right of first refusal was signed about 16 months prior to this notice. Dr. Rash had had the right to move that property any time during that 16 months, and he took no action. He never moved it, never touched it. The claim that he had this person lined up to sign it, to move the property, if you look at the record, all he did was he got an estimate from some mover that said, well, yeah, we can move that, it's going to take a lot of work, you know, but it would be about $10,000 to move it. That's the extent of the preparation. So we go from July of 2002 when this agreement was signed to November of 2003. There's been no effort to move this. November of 2003, the notice comes. We'll move it within 10 days. We'll get it taken care of. I heard a counsel argue, well, he was making preparations to do it in the spring of 04. Well, it didn't get moved in the spring of 04 either. It didn't get moved in May. And when he said in May, I'll move it Monday, it didn't get moved that Monday either. And, in fact, they discovered that he had not obtained any permits to move it. So if you look at the other side, it's been this constant dealing with this. And that doesn't even count the other house that he took that the testimony showed that he had no right to  So there's a long pattern here that I don't think the plaintiff can say, look, I was just working. I was working toward moving this house because that's not true. It had been more than two, almost two years after this agreement was signed that he had moved the house. It didn't mean any effort. I would like, I think even if the court decides there's some material breach problem here, which I don't think there is, I don't think you can decide that when there's no testimony that I was fooled as the plaintiff, I misunderstood as the plaintiff. What we've got here is a plaintiff who perfectly understood, thought there was a problem with the notice, but yet throws the line out and says, look, we'll move this within ten days, and, yes, we won't move it over there, and we'll do all these things. Why would you do that unless you intended to have Drury rely on that? Why would you call them up and say, I need more time, unless you wanted Drury to rely on the fact that this notice had gone out and that it was effective? There really isn't any other issue with that. And I'm glad you raised the issue of damages. I didn't have time to talk about that. I'd like to just say one thing about that. There was an appraiser hired on this thing. He'd never seen the house. He'd never seen a picture of the house. It was a 52-year-old ranch house that had construction materials stuck in it that had been vacant for a long time. This is not somebody's home. This is sitting on a piece of commercial property. The testimony was, well, from the appraiser, I considered it to have a 20-year-old age for purposes of life of this house, even though it was 52 years old, and that was based upon Dr. Rashid's statement to the appraiser that it was in great shape. The appraiser hired by Drury said, look, you can't value it this way because it's salvage. This is a house that is to be moved, so you can't value this house like it's sitting in the ground. There's nothing in the record about what it would take to build a basement, build a foundation, to use this house, because if Dr. Rashid had sought to move this house, he's got a house on wheels. He doesn't have a house in the ground. He does not have a house with a basement. He doesn't have a house with any utilities. Did Drury's expert offer a salvage value to Judge Curry? He did not. He had never seen the property. He had never seen a picture of the property. So Judge Curry did subtract the value of the basement? No, I don't believe he did. He took a comparable that was cited by the appraiser, I think took the land value off, and then took $10,000 off because of this letter that said it would be about $10,000 to move. But the letter also said— He took $18,000 off for the value of the land and I think $19,000 for the value of the basement. But I'll check with him. Okay. But, I mean, for that basement, but, okay, what does it take to get a basement to put it in is my point. If you're moving a house, that house does you no good up on wheels. How much is it going to cost to build a foundation, build a basement, hook up utilities, do the groundwork, move it, get the permits, and, according to the letter Dr. Rashid submitted, do a lot of work once this thing is moved? No. Thank you. Thank you, counsel. The court will take this matter under advisement and will recess for a panel change, and we will reach a resolution of this with this bill.